UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>APPROXIMATELY 1,000,000.011111 USDT, FORMERLY ASSOCIATED WITH VIRTUAL CURRENCY ADDRESS TTZYKTHII7FK-TVTNMGB14CNAVN3BWUG2AF;<br><br>APPROXIMATELY 1,000,001.261621 USDT, FORMERLY ASSOCIATED WITH VIRTUAL CURRENCY ADDRESS TKHF6N5NGMP-A1SMHMVV1YDTHNIMFDPM59R;<br><br>APPROXIMATELY 10,002.7325 USDT, FORMERLY ASSOCIATED WITH VIRTUAL CURRENCY ADDRESS 0XAD5CD161399-B3686461164D2E086055DC8E53C55;<br><br>APPROXIMATELY 528,444.6649 USDT, FORMERLY ASSOCIATED WITH VIRTUAL CURRENCY ADDRESS TUSXPPG2QOY-RPKQZMKBMEBCFTTEGA88JUH<br><br>and<br><br>ANY FUNDS OR CRYPTOCURRENCY DERIVED THEREFROM,<br><br>Defendants. | CASE NO. CV26-4581<br><br>**VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

COMES NOW the United States, by and through its undersigned counsel, and alleges:

## I. NATURE OF THE ACTION

1. This is a civil action *in rem*, brought to enforce the provision of 18 U.S.C. § 981(a)(1)(C) for forfeiture of property that constitutes or is derived from proceeds traceable to Wire Fraud, in violation of 18 U.S.C. § 1343.

2. This is a civil action *in rem*, brought to enforce the provision of 18 U.S.C. § 981(a)(1)(A) for forfeiture of property involved in Money Laundering, in violation of 18 U.S.C. § 1956, or any property traceable to such property.

3. The Defendant Cryptocurrency consists of the following property, formerly associated with the identified virtual currency addresses accessible through Tether International S.A. de C.V. ("Tether"), seized by the United States Federal Bureau of Investigation ("FBI") on or about August 25, 2026, pursuant to criminal and civil forfeiture warrants:

a. approximately 1,000,000.011111 USDT, formerly associated with address TTZYkTHii7FktVtnMGb14cnAVn3BwUg2AF ("Subject Address 1");

b. approximately 1,000,001.261621 USDT, formerly associated with address TKHf6n5ngMpA1SmhmvV1YdtHNimfDPM59r ("Subject Address 2");

c. approximately 10,002.7325 USDT, formerly associated with address 0xad5cd161399b3686461164d2e086055dc8e53c55 ("Subject Address 3");

d. approximately 528,444.6649 USDT, formerly associated with address TUsXPpG2QoyrpkQzMkbMEbcfttEga88juH ("Subject Address 4"); and

e. any funds or cryptocurrency derived therefrom.

## II. PLAINTIFF AND DEFENDANT *IN REM*

4. The plaintiff is the United States of America (the "Plaintiff" or "Government" or "United States").



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

5. The defendant consists of cryptocurrency totaling approximately 2,538,448.670153 USDT, formerly associated with the virtual currency addresses identified in paragraph 3 above (collectively, the "Subject Addresses"), seized by the Federal Bureau of Investigation ("FBI") on or about August 25, 2026 (collectively, the "Defendant Cryptocurrency").

6. The Subject Addresses were associated with unhosted wallets that contained USDT tokens. The USDT tokens were managed by Tether International S.A. de C.V. ("Tether").

7. Pursuant to two forfeiture seizure warrants issued in the Western District of Washington (Cause No. MC26-017, executed on or about March 16, 2026, and Cause No. MC26-031, executed on or about May 5, 2026), Tether re-issued the USDT and transferred it to a government-controlled wallet. The United States took custody of the Defendant Cryptocurrency on or about August 25, 2026. The Defendant Cryptocurrency is currently in the custody of the United States Marshals Service.

8. According to finance.yahoo.com, when the Defendant Cryptocurrency was transferred to the United States on or about August 25, 2026, one USDT was valued at approximately $0.9999, making the Defendant Cryptocurrency worth approximately $2,538,195.

## III. JURISDICTION AND VENUE

9. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345 and has jurisdiction over an action for forfeiture under 28 U.S.C. §§ 1355(a) and (b).

10. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

11. Pursuant to 18 U.S.C. § 981(f), all right, title, and interest in the Defendant Cryptocurrency vests in the United States at the time of the acts giving rise to the forfeiture.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

12. Pursuant to Supplemental Rule G(2)(f), facts in support of a reasonable belief that the United States will be able to meet its burden of proof at trial are as follows and have been verified by the attached Verification of FBI Special Agent Andrew Cropcho.

13. As provided in Supplemental Rule G(3)(b)(i), the Clerk of Court is required to issue a warrant to arrest the Defendant Cryptocurrency if it is in the government's possession, custody, or control. As such, the Court will have *in rem* jurisdiction over the Defendant Cryptocurrency when the accompanying Warrant of Arrest *In Rem* is issued, executed, and returned to the Court.

## IV. SUMMARY OF BASES FOR FORFEITURE

### A. Background of the Scheme

14. The United States alleges that the Defendant Cryptocurrency constitutes, or was derived from, proceeds traceable to violations of 18 U.S.C. § 1343 (Wire Fraud) and constitutes property involved in violations of 18 U.S.C. § 1956 (Money Laundering). The Defendant Cryptocurrency is, therefore, subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C).

15. The Defendant Cryptocurrency contains funds swindled from victims, including victims in the Western District of Washington, through the course of investment schemes, which are described in more detail herein. These funds were subsequently laundered through a series of cryptocurrency addresses and cryptocurrency "swaps" before coming to rest in the Subject Addresses with which the Defendant Cryptocurrency was formerly associated.

16. Based on reporting to the FBI and public resources, fraudulent investment schemes involving cryptocurrency platforms named SZVON, CZSRX, USCHC, MCUGS, WNCSZ-EX, OKZYC, and others, have been used to defraud members of the public, including at least one person in the Western District of Washington. Some of the



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

victims also invested in stocks, including those with ticker symbols DXST, POM, KXIN, MIMI, EPSM, FMFC, and VSME.

17. The perpetrators of the fraud schemes used multiple techniques to facilitate the fraud and to conceal and disguise the source, origin, nature, ownership, destination, and control of the illicitly procured funds. They instructed victims to transfer funds to multiple virtual currency addresses that they controlled, then rapidly moved the funds from the original gaining addresses to other addresses they controlled. They used multiple virtual currency exchange accounts, conducted cryptocurrency “swaps” (such as from Ether to USDT) and comingled funds defrauded from multiple victims with other funds to further conceal and disguise the fraud proceeds.

18. Using the Lowest Intermediate Balance Rule (“LIBR”) tracing methodology, law enforcement traced approximately $590,609 in funds defrauded from victims of the investment fraud schemes to the Defendant Cryptocurrency. The proceeds traced to the Defendant Cryptocurrency are forfeitable as proceeds of the underlying wire fraud. The remaining Defendant Cryptocurrency is forfeitable as property involved in money laundering.

***The Cryptocurrency Investment Scheme***

19. Victims were engaged by one or more unidentified persons online about cryptocurrency investment opportunities. After sending funds to a fraudulent platform for investment, some victims believed that profits were being generated on that investment, and, sometimes, small amounts of the alleged profit were even available for withdrawal. Due to the apparent profits and ability to make small withdrawals, the victims were enticed to continue to invest their own funds into the fraudulent platform. Over time, apparent gains turned into losses, which were blamed on various excuses, such as a liquidation event, because the platform was hacked, or because of mistakes. After the initial losses, the victims were convinced to continue to invest to recoup their losses, but



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

they only lost more funds. The victims' losses were exacerbated even further via fabricated recovery and withdrawal fees charged by the fraudulent investment platform.

***The Stock Investment Scheme***

20. Victims were engaged by one or more unidentified persons online about fraudulent stock investment opportunities. Some of the stock ticker symbols were DXST, POM, KXIN, MIMI, EPSM, FMFC, VSME, and others.

21. According to Yahoo Finance, the corresponding company for each of the stock ticker symbols is domiciled in the country identified in the table below:

| Ticker Symbol | Domicile Country |
|---|---|
| POM | China |
| DXST | China |
| KXIN | China |
| MIMI | Hong Kong |
| EPSM | China |
| FMFC | Cambodia |
| VSME | Hong Kong |

22. Each victim who invested in the recommended stocks used their own brokerage account, like Charles Schwab or Robinhood. Each victim reported to the FBI that the stock crashed shortly after the victim made their investment, causing them to take a loss on the investment.

23. Next, after losing money on the stock investment, victims were contacted online by one or more unidentified persons who offered a "recompensation plan" to recoup the stock losses. The so-called recompensation plan required the victim to send cryptocurrency to a fraudulent cryptocurrency investment platform. After sending funds to the platform for supposed investment, some victims believed that profits were being



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

generated on that investment, and, sometimes, small amounts of the alleged profits were even available for withdrawal. Due to the apparent profits and ability to make small withdrawals, the victims were enticed to continue to invest their own funds into the fraudulent platform. Over time, apparent gains turned into losses which were blamed on various excuses, such as making mistakes or not following instructions. Other victims were told their funds were frozen because they refused to pay additional fees, such as a withdrawal fee or verification fee.

24. Using the Lowest Intermediate Balance Rule ("LIBR") tracing methodology, investigators were able to trace funds from the victims to the four Subject Addresses with which the Defendant Cryptocurrency was formerly associated:

| SUBJECT ADDRESS # | SUBJECT ADDRESS | SEIZED CRYPTOCURRENCY |
|---|---|---|
| **SUBJECT ADDRESS 1** | TTZYkTHii7FktVtnMGb14cnAVn3BwUg2AF | 1,000,000.011111 USDT |
| **SUBJECT ADDRESS 2** | TKHf6n5ngMpA1SmhmvV1YdtHNimfDPM59r | 1,000,001.261621 USDT |
| **SUBJECT ADDRESS 3** | 0xad5cd161399b3686461164d2e086055dc8e53c55 | 10,002.732486 USDT |
| **SUBJECT ADDRESS 4** | TUsXPpG2QoyrpkQzMkbMEbcfttEga88juH | 528,444.664935 USDT |
| | **TOTAL:** | **2,538,448.670153 USDT** |

## V. PURPOSE OF FORFEITURE

25. The purpose of this forfeiture action *in rem* is two-fold. First, forfeiture of the Defendant Cryptocurrency provides a means for the United States to help victims of the fraud schemes recover their funds. Second, forfeiture deters criminal activity by forfeiting and vesting title of the Defendant Cryptocurrency with the United States so that criminals do not maintain the fruits of crime and do not keep property that facilitated or was involved in crime.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## VI. THE LAW

26. Pursuant to 18 U.S.C. § 1343, it is unlawful to devise or intend "to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmit[] or cause[] to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice. . . ."

27. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [a federal money laundering offense, 18 U.S.C. § 1956], or any property traceable to such property" is subject to forfeiture to the United States.

28. Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting a 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense" is subject to forfeiture to the United States.

29. Pursuant to 18 U.S.C. § 1956(a)(1), it is unlawful to knowingly conduct or attempt to conduct a "financial transaction" with proceeds from "specified unlawful activity" ("SUA") with specific intent to: promote the SUA, conceal or disguise the source, origin, nature, ownership, or control of the proceeds, evade reporting requirements, or evade taxes.

30. Pursuant to 18 U.S.C. § 1956(h), it is also unlawful to conspire to commit a money laundering offense.

31. Pursuant to 18 U.S.C. § 1956(c)(7) and 18 U.S.C. § 1961(1)(B), the offense of wire fraud, in violation of 18 U.S.C. § 1343, constitutes specified unlawful activity.

//

//

//



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## VII. BACKGROUND ON DIGITAL OR VIRTUAL CURRENCY

32. Virtual or Digital Currency: Digital currency (also known as cryptocurrency or virtual currency)[1] is generally defined as an electronic-source unit of value that can be used as a substitute for fiat currency (i.e., currency created and regulated by a government). Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.[2] Digital currency is not issued by any government or bank (in contrast to fiat currency) and is, instead, generated and controlled through computer software operating on a decentralized peer-to-peer network. Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud based servers.

33. Digital currency is legal in the United States and accepted for legitimate financial transactions. However, it is also often used for conducting illegal transactions or for concealing or disguising the true nature, source, location, ownership, or control of illegally obtained criminal proceeds. Bitcoin ("BTC") and Ethereum ("ETH") are some of the most commonly used and well-known digital currencies.

34. Stablecoins: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDT is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

---

[1] For purposes of this Complaint, the terms "digital currency," "cryptocurrency," and "virtual currency" are used interchangeably and address the same concept.

[2] Fiat currency is currency issued and regulated by a government, such as the U.S. Dollar, Euro, or Japanese Yen.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

35. Tether: Tether International S.A. de C.V. ("Tether") is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens. Tether does not host wallets or virtual currency addresses.

36. Perpetrators of fraud will often conduct an otherwise unnecessary number of transactions in the transfer of funds in an effort to layer ill-gotten funds to ultimately conceal or disguise the nature, location, source, ownership, or control of those proceeds when transferred into a cryptocurrency exchange. The number of hops in the transactions is a strong indication that the movement of funds was performed in a manner meant to conceal or disguise the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity, to wit, wire fraud.

37. Perpetrators of fraud often launder proceeds of their fraud schemes through several virtual wallet addresses or accounts before transferring the proceeds to those individuals near or at the top of the criminal organization's hierarchy.

38. Virtual or Digital Currency Addresses: Digital or virtual currency addresses are the specific virtual locations to which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of alphanumeric characters. A user of virtual currency can utilize multiple addresses at any given time and there is no limit to the number of addresses any one user can utilize.

39. Private Key: Each virtual currency address is controlled through a unique corresponding private key, a cryptographic equivalent of a password needed to access the address. Only the holder of an address's private key can authorize a transfer of virtual currency from that address to another address.

40. Address Owner: The identity of an address owner is generally considered to be pseudonymous (unless the owner opts to make the information publicly available), often law enforcement and currency exchanges can use the blockchain to identify the owner of a particular address and trace fraud proceeds from victims to one or more



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

exchanges or wallets. The analysis can also, in some instances, reveal additional addresses controlled by the same individual or entity.

41. Virtual currency wallet: There are various types of virtual currency wallets, including software wallets, hardware wallets, paper wallets. A software wallet is a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys. A virtual currency wallet allows users to store, send, and receive virtual currencies. A virtual currency wallet can hold many virtual currency addresses at the same time.

42. Hosted and Unhosted Wallets: Wallets that are hosted by third parties are referred to as "hosted wallets" because the third party retains a customer's funds until the customer is ready to transact with those funds. Conversely, wallets that allow users to exercise total, independent control over their funds are often called "unhosted" wallets.

43. Blockchain: The code behind many virtual currencies requires that all transactions involving that virtual currency be publicly recorded on what is known as a blockchain. The blockchain is essentially a distributed public ledger, run by a decentralized network of computers and using that blockchain's technology, containing an immutable and historical record of every transaction. The blockchain can be updated multiple times per hour and records every virtual currency address that has ever received that virtual currency and maintains records of every transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies.

44. Blockchain explorer: Blockchain explorers are online tools that operate as a blockchain search engine. Blockchain explorers enable users to search for and review transactional data for any addresses on a particular blockchain. A blockchain explorer is software that uses API and blockchain nodes to draw data from a blockchain and uses a database to arrange and present the data to a user in a searchable format.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

45. Ethereum: Ethereum ("Ether" or "ETH") is a cryptocurrency that is open-source and is distributed on a platform that uses "smart contract" technology. Transactions involving ETH are publicly recorded on the Ethereum blockchain, which allows anyone to track the movement of ETH.

46. Virtual Currency Exchange: Virtual currency exchanges ("VCEs") are trading and/or storage platforms for virtual currencies such as BTC and ETH. Many VCEs also store their customers' virtual currency in virtual currency wallets. As previously stated, these wallets can hold multiple virtual currency addresses. Because VCEs act as money services businesses, they are legally required to conduct due diligence of their customers (i.e., "know your customer" or "KYC" checks) and to have anti-money laundering programs in place.

47. Blockchain analysis: It is virtually impossible to look at a single transaction on a blockchain and immediately ascertain the identity of the individual behind the transaction. That is because blockchain data generally consists only of alphanumeric strings and timestamps. But law enforcement can obtain leads regarding the identity of the owner of an address by analyzing blockchain data to figure out whether that same individual is connected to other relevant addresses on the blockchain. To analyze blockchain data, law enforcement can use blockchain explorers as well as commercial services offered by several different blockchain-analysis companies. These companies analyze virtual currency blockchains and attempt to identify the individuals or groups involved in transactions. "For example, when an organization creates multiple [cryptocurrency] addresses, it will often combine its [cryptocurrency] addresses into a separate, central [cryptocurrency] address (i.e., a "cluster"). It is possible to identify a 'cluster' of [cryptocurrency] addresses held by one organization by analyzing the [cryptocurrency] blockchain's transaction history. Open-source tools and private software products can be used to analyze a transaction." *United States v. Gratkowski*, 964 F.3d



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

307, 309 (5th Cir. 2020). Through numerous unrelated investigations, law enforcement has found the information provided by these tools to be reliable.

## VIII. SCHEME TO DEFRAUD AND FINANCIAL TRACING

48. This case involves fraudulent investment schemes perpetrated on victims across the United States, including in the Western District of Washington. After defrauding funds from their victims, the perpetrators engaged in layered financial transactions designed, in whole or in part, to conceal and disguise the nature, location, source, ownership, or control of the proceeds. Proceeds defrauded from multiple identified victims of the fraud schemes flowed into and through virtual currency addresses controlled by the perpetrators. Funds from twelve identified victims were ultimately traced to the four Subject Addresses, where they were seized.

### A. FUNDS TRACED TO SUBJECT ADDRESSES 1 AND 2

49. Law enforcement traced approximately $452,385.60 in funds defrauded from three identified victims to Subject Addresses 1 and 2, as described below:

***Victim 1 – Alpha***

50. Alpha resides in the Western District of Washington. On or about February 16, 2026, Alpha reported to the FBI that they lost about $1 million because of a cryptocurrency investment scheme called SZVON. Alpha sent funds from their Coinbase account.

51. Alpha was first contacted on or around July 25, 2025, by someone identifying herself as Emily. Emily convinced Alpha to liquidate their own stock holdings so they could participate in what was described as an LZMH/NTCL stock compensation plan. Around August 1, 2025, Emily directed Alpha to register an account on SZVON, a trading platform.

52. Emily instructed Alpha how to make cryptocurrency deposits and how to perform cryptocurrency contract trading. Around August 20, 2025, after sending about $80,000 worth of cryptocurrency to SZVON, Alpha was told that they lost a substantial



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

amount of funds due to leverage issues; Emily assured Alpha the losses could be recovered.

53. Next, Emily introduced Alpha to a second compensation plan. It appeared that Alpha began to make small profits but then they suffered losses again, which Emily attributed to trading mistakes.

54. Around October 2025, the cycle continued when Emily introduced Alpha to a bonus deposit opportunity, where Alpha was convinced to make even larger deposits because Emily convinced Alpha that large trades were pending.

55. Eventually, around the end of October 2025, Alpha was asked to pay VIP fees and collateral payments because their funds were frozen. Around November 17, 2025, Alpha's balance on the SZVON platform displayed a balance of about $4.6 million, but they were unable to withdraw any of the funds, which remained the case through January of 2026, when Alpha realized they had been defrauded and sought legal counsel.

56. Based on records provided by Alpha, they sent the US dollar equivalent of cryptocurrency to the following six addresses, between July 2025 and December 2025:

| Address | Total |
|---|---|
| 0x105c1378663d8959b5eecddb58c1c56aa8a36c6e | $60,613.90 |
| 0x23cf6581bf7ba511919c029ca75a552cde09af84 | $164,060.67 |
| 0x58e061fe56c2510179b8fc556909174051c3372d | $173,552.35 |
| 0xa435f9404251af51d3966705c2970794e1309473 | $2,356.96 |
| 0xa6fddb5b4f9edab39bf37e026b04ea3047b2e780 | $436,382.22 |
| 0xbc2d923a68931432a362a00e042a085caa1ccc06 | $164,768.84 |
| **Total** | **$1,001,734.94** |

57. The stablecoin USDT comprised about 99%, or 989,624 USDT, of the funds transferred by Alpha to SZVON.

58. USDT sent by Alpha to two of these virtual currency addresses (0xa6fddb5b4f9edab39bf37e026b04ea3047b2e780 ("0xa6fddb") and



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

0x58e061fe56c2510179b8fc556909174051c3372d ("0x58e061")) were traced to Subject Addresses 1 and 2.

***Alpha Transfers to 0xa6fddb***

59. Between approximately July 30, 2025, and October 31, 2025, 0xa6fddb received a total of about 443,638 USDT, of which about 423,928 USDT (95%) was sent by Alpha from their Coinbase account. Alpha sent the 423,928 USDT in 33 different transfers, and, except for three transfers, each amount transferred by Alpha was transferred out of 0xa6fddb within about 10 minutes or less.

60. The funds transferred to 0xa6fddb were thereafter transferred to three different addresses: 0x112405dd5efde7348e30c6a2911d19aff25cb7f6 ("0x112405"), 0x1d1b38dc3993022c3bad01f2657c24a3252ece69 ("0x1d1b38"), and 0x8e01788fcf676ce200c91131701733708cc7c89b ("0x8e0178").

61. In the transfers from 0xa6fddb to 0x112405, about 169,098 USDT traceable to Alpha was consolidated with USDT from at least two other victims, as well as USDT from unknown sources, which is explained in detail below in the ***Consolidation 1*** section, paragraphs 84-85.

62. In the transfers from 0xa6fddb to 0x1d1b38, about 131,824 USDT traceable to Alpha was consolidated with USDT from at least one other victim, as well as USDT from unknown sources, which is explained in detail below in the ***Consolidation 2*** section, paragraphs 86-87.

63. In the transfers from 0xa6fddb to 0x8e0178, about 123,004 USDT traceable to Alpha was consolidated with USDT from at least one other victim, as well as USDT from unknown sources, which is explained in detail below in the ***Consolidation 3*** section, paragraphs 88-89.

//

//

//



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

***Alpha Transfers to 0x58e061***

64. Between about November 22, 2025, and December 15, 2025, 0x58e061 received about 173,564 USDT, all of which came from Alpha. 0x58e061 subsequently transferred the 173,564 USDT to 0xa71233d0775f4bb6f12b44d227d64856cdcc7347 ("0xa71233"), where it was consolidated with funds from at least one other victim, as well as USDT from unknown sources, which is explained in detail below in the ***Consolidation 4*** section, paragraphs 90-95.

***Victim 2 – Bravo***

65. Bravo, a resident of Texas, reported to the FBI that they lost approximately $180,000 because of a cryptocurrency investment scheme called SZVON. According to Bravo, starting in about April 2025, they were contacted by someone who identified herself as Emily, a financial advisor. Emily advised Bravo to buy stocks, which caused Bravo to lose money. Around July or August of 2025, Emily convinced Bravo that they could recoup their losses through cryptocurrency contracts. At first, Emily told Bravo that Bravo lost money because Bravo made mistakes, but eventually it appeared to Bravo that they started making profits. When Bravo later tried to remove funds from the SZVON account, however, Bravo could not remove them, and Bravo was charged withdrawal fees, conversion fees, and at least one other type of fee. Since Bravo was only able to send funds to SZVON, and they did not let Bravo withdraw funds, Bravo realized it was a fake platform.

66. Most of the USDT sent by Bravo to SZVON was sent from their Coinbase and Crypto.com accounts to 0xe20985cfa8f39975ac3e14072a2ee03e765b7a5b ("0xe20985").

67. Between approximately August 21, 2025, and October 30, 2025, 0xe20985 received a total of about 113,451 USDT, of which about 113,050 USDT was sent by Bravo.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

68. The funds transferred to 0xe20985 were thereafter transferred to two different addresses: 0x112405 and 0x8e0178.

69. In the transfers from 0xe20985 to 0x112405, about 20,271 USDT traceable to Bravo was consolidated with the 169,098 USDT traceable to Alpha, as well as USDT from unknown sources, which is explained in detail below in the ***Consolidation 1*** section, paragraphs 84-85.

70. In the transfers from 0xe20985 to 0x8e0178, about 92,778 USDT traceable to Bravo was consolidated with the 123,004 USDT from Alpha, as well as USDT from unknown sources, which is explained in detail below in the ***Consolidation 3*** section, paragraphs 88-89.

***Victim 3 – Charlie***

71. Charlie, a resident of Texas, reported to the FBI that they lost approximately 145,870 USDT because of a cryptocurrency investment scheme called SZVON. According to Charlie, starting in at least July 2025, they were contacted by someone identifying herself as Mary Campbell, an assistant to Richard Robinson. Charlie was convinced to join a cryptocurrency platform called SZVON. At first, it appeared that Charlie was making profits, and they even researched the domain szvon.com and learned that it had been in existence for 12 years. After appearing to earn profits, Charlie attempted to make withdrawals but they were charged a $64,000 release fee, which Charlie paid. However, after paying the release fee, Charlie was told the SZVON platform had been hacked and Charlie's funds were lost. Charlie was later told that their funds were frozen, yet recoverable, and to recover the funds Charlie had to pay a $65,000 fee to unfreeze the funds. Charlie then realized SZVON was an investment and recovery scam.

//

//

//



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

72. Charlie provided a screenshot of the SZVON platform, which appears below:




73. The USDT sent by Charlie to SZVON was sent from their Coinbase account to 0x4ca3130b8466668a4ecb4ddc53aab4c25604e857 (“0x4ca313”).

74. Between about July 16, 2025, and September 5, 2025, 0x4ca313 received about 145,847 USDT, of which about 145,751 USDT was sent by Charlie

75. The funds transferred to 0x4ca313 were thereafter transferred to two different addresses: 0x112405 and 0x1d1b38.

76. In the transfers from 0x4ca313 to 0x112405, about 82,635 USDT traceable to Charlie was consolidated with the 20,271 USDT traceable to Bravo and 131,824 USDT traceable to Alpha, as well as USDT from unknown sources, which is explained in detail below in the ***Consolidation 1*** section, paragraphs 84-85.

//

//



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

77. In the transfers from 0x4ca313 to 0x1d1b38, about 63,116 USDT traceable to Charlie was consolidated with the 131,824 USDT traceable to Alpha, as well as USDT from unknown sources, which is explained in detail below in the ***Consolidation 2*** section, paragraphs 86-87.

***Victim 4 – Delta***

78. Delta, a resident of Texas, reported to the FBI that they lost approximately 257,853 USDT because of a cryptocurrency investment scheme called MCUGS. According to Delta, starting in at least December 2025, Delta joined a WhatsApp group about making money on stocks. Related to this WhatsApp group, Delta lost about $32,000 on the VSME stock. The stock group disappeared, but a few weeks later Delta was contacted to join a compensation plan to help regain the losses.

79. Delta invested money in trades related to the compensation plan, and Delta saw in the WhatsApp channel that others who "won" money were able to make withdrawals from the website they were using, named MCUGS.com. Delta sent funds to MCUGS.com for investment, and over time the balance in Delta's account showed that it had up to about $1.4 million of value, so Delta tried to withdraw about $250,000. After Delta tried to make the withdrawal, MCUGS.com claimed it was hacked, and that Delta should join a VIP channel, costing about $10,000, which Delta paid. Delta then paid a $43,000 conversion fee, and a $99,000 temporary compliance margin fee for a bank AML review. The AML review made Delta suspicious that they were being scammed, so Delta made an inquiry to their bank and learned that no one contacted the bank about any large deposits. After this, Delta reported what happened to the FBI.

80. The USDT sent by Delta to MCUGS was sent primarily from their Coinbase account to 0xae4c6fe75a86f671169ededc76877fd9dc92981c ("0xae4c6f").

81. Between about December 12, 2025, and January 29, 2026, 0xae4c6f received about 237,058 USDT, of which about 225,961 USDT was sent by Delta.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

82. All of the funds transferred to 0xae4c6f were thereafter transferred to one address: 0xa71233.

83. In the transfers from 0xae4c6f to 0xa71233, about 225,961 USDT traceable to Delta was consolidated with the 173,564 USDT traceable to Alpha, as well as USDT from unknown sources, which is explained in detail below in the ***Consolidation 4*** section, paragraphs 90-95.

***Consolidation 1, 0x112405***

84. In total, 0x112405 received about 1,715,740 USDT, of which about 272,005 USDT is traceable to Alpha, Bravo, and Charlie.

85. Of the 1,715,740 USDT received by 0x112405, about 1,704,167 USDT (99%) was transferred to one account at a VCE named OKX (the "OKX Account"). Based on LIBR tracing, all 272,005 USDT that is traceable to victim funds were sent to the OKX Account.

***Consolidation 2, 0x1d1b38***

86. In total, 0x1d1b38 received about 1,131,242 USDT, of which about 194,941 USDT is traceable to Alpha and Charlie.

87. Of the 1,131,242 USDT received by 0x1d1b38, about 1,059,893 USDT (93%) was transferred to the OKX Account. Based on LIBR tracing, all 194,941 USDT that is traceable to victim funds were sent to the OKX Account.

***Consolidation 3, 0x8e0178***

88. In total, 0x8e0178 received about 1,246,363 USDT, of which about 215,783 USDT is traceable to Alpha and Bravo.

89. Of the 1,246,363 USDT received by 0x8e0178, about 1,244,726 USDT (99%) was transferred to the OKX Account. Based on LIBR tracing, all 215,783 USDT that is traceable to victim funds were sent to the OKX Account.

//

//



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

***Consolidation 4, 0xa71233***

90. In total, 0xa71233 received about 4,719,108 USDT, of which about 399,525 USDT is traceable to Alpha and Delta.

91. All of the USDT received by 0xa71233 were transferred to three different addresses: 0x914713c6d484a9bcba013edad6d5f8f15f36ed51, (“0x914713”), 0x9295b6a91a08002b4f258d1478e68fead19d8438 (“0x9295b6”), and 0xfcfde3361d2d834f5dd094156d22bdea5cbf69a3 (“0xfcfde3”).

92. About 1,698,560 USDT was transferred from 0xa71233 to 0x914713, which contained about 119,330 USDT of funds traceable to victims. All of the USDT transferred to 0x914713 was thereafter transferred to the OKX Account.

93. About 1,177,884 USDT was transferred from 0xa71233 to 0x9295b6, which contained about 173,563 USDT of funds traceable to victims. All of the USDT transferred to 0x9295b6, except for about 1,000 USDT, was transferred to the OKX Account.

94. About 1,842,662 USDT was transferred from 0xa71233 to 0xfcfde3, which contained about 106,630 USDT of funds traceable to victims. All of the USDT transferred to 0xfcfde3, except for about 1,274 USDT, were transferred to the OKX Account.

//

//

//

//

//



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

95. The series of consolidation transactions described above are depicted below:




***OKX Account, USER ID 509087299267645635***

96. OKX records show that, on or about November 11, 2023, an OKX account was opened in the name of 刘念昌. The IP log records for the account show that IP addresses in China were primarily used to access the account. The OKX Account received deposits of various virtual currencies, including USDT, USDC, bitcoin, and ether. At least two addresses assigned to the OKX Account received fraud proceeds: addresses 0x63ab0c9e3042ac135934b3792bde52642be1bc84 and 0x97869d07be0549deb181e c562bee411d733bdf84.

97. Regarding USDT, the OKX Account received a total of about 9,453,724 USDT, which includes about 1,082,255 USDT traceable to Alpha, Bravo, Charlie, and Delta.

98. OKX provided records to the FBI for the OKX Account, including deposit history, trading history, funding account history, and withdrawal history. The records



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

show that the USDT traceable to Alpha, Bravo, Charlie, and Delta were converted from USDT that is transferrable on the Ethereum blockchain, to USDT that is transferrable on the TRON blockchain.

***OKX to Subject Address 1, TTZYkTHii7FktVtnMGb14cnAVn3BwUg2AF***

99. On about August 12, 2025, the OKX Account sent about 10,197 USDT to TB3SZ4MnR643k62hud3KPTQJniMV9jZYjt ("TB3SZ4Mn"), containing about 7,996 USDT traceable to victims. On about August 26, 2025, The OKX Account sent about 162,997 USDT to TB3SZ4Mn, containing about 62,772 USDT traceable to victims. These were the only two USDT deposits received by TB3SZ4Mn.

100. On about October 3, 2025, TB3SZ4Mn transferred its entire balance of about 173,195 USDT, including about 70,768 USDT traceable to victims, to TFtUwuYGC4CYSSRU5PFt4hNukyPHQxHU1f ("TFtUwuYG").

101. On about September 2, 2025, the OKX Account sent about 104,103 USDT to TFCZZZnZZLvXpyjF2iDcNm4TnrbAcvVz39 ("TFCZZZnZ"), containing about 10,374 USDT traceable to victims. On about September 3, 2025, the OKX Account sent about 137,897 USDT to TFCZZZnZ, containing about 4,945 USDT traceable to victims. These were the only two USDT deposits received by TFCZZZnZ.

102. On about October 3, 2025, TFCZZZnZ transferred its entire balance of about 242,000 USDT, including about 15,320 USDT traceable to victims, to TFtUwuYG, where it was consolidated with the USDT sent by TB3SZ4Mn, including about 70,768 USDT traceable to victims.

103. Between about September 5, 2025, and February 1, 2026, the OKX Account transferred about 2,252,108 USDT to TFtUwuYG, including about 401,733 USDT traceable to victims. The USDT sent directly by the OKX Account to TFtUwuYG comprised about 79% of the total deposits it received. In total, TFtUwuYG received about 487,821 USDT that is traceable to victims.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

104. TFtUwuYG sent only one transfer to TTpYz18KnYVYGrcbFutABqPzS5nVBW1Cnq ("TTpYz18K"), which was on about October 2, 2025, for about 494,300 USDT, containing about 142,703 USDT that is traceable to victims. Additional victim funds were consolidated into TTpYz18K before being transferred to TTZYkTHii7FktVtnMGb14cnAVn3BwUg2AF ("Subject Address 1"), which is described below.

105. Between about October 18, 2025, and March 9, 2025, TUsXPpG2QoyrpkQzMkbMEbcfttEga88juH ("TUsXPpG2") received about 839,265 USDT, of which about 795,208 USDT came from the OKX Account. The 795,208 USDT transferred by the OKX Account to TUsXPpG2 contained about 45,270 USDT that is traceable to victims.

106. Address TUsXPpG2 only made withdrawals to two addresses, but only one of those addresses received USDT that is traceable to victims using the LIBR method: TTpYz18K. Address TUsXPpG2 made two transfers to TTpYz18K, totaling about 603,193 USDT, which contained about 35,292 USDT that is traceable to victim funds.

107. The transfers of victim funds described above, from TFtUwuYG to TTpYz18K, and from TUsXPpG2 to TTpYz18K, total about 177,995 USDT traceable to victim funds, which is about 11% of the total USDT deposits received by TTpYz18K.

108. Address TTpYz18K transferred about one third of its total deposits, about 574,285 USDT, to Subject Address 1. Based on LIBR tracing, the 574,285 USDT transferred by TTpYz18K to Subject Address 1 contained about 177,995 USDT (30%) that is traceable to victim funds.

109. The transfer from TTpYz18K into Subject Address 1 was one of three deposits received by Subject Address 1, and it amounted to over 50% of the total deposits received by Subject Address 1. The only transfer out of Subject Address 1 was for 100 USDT. As such, the 177,995 USDT traceable to victim funds comprise about 18% of the 1,000,000 USDT balance in Subject Account 1, which was seized.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

***OKX to Subject Address 2, TKHf6n5ngMpA1SmhmvV1YdtHNimfDPM59r***

110. Between about August 3, 2025, and August 6, 2025, TUrjmfUFkvcZz2jDL9qPzp5knWjamoS8bb ("TUrjmfUF") received two deposits from the OKX Account, totaling about 205,610 USDT, which comprise over 99% of the deposits received by TUrjmfUF. These two deposits contained a total of about 40,830 USDT that is traceable to victim funds. Address TUrjmfUF thereafter depleted its USDT balance in four transfers. The fourth and final transfer, on about September 18, 2025, was sent by TUrjmfUF to TGSRYs2D5Eg7yt7KNZjEES7w94Zt71Ai8a ("TGSRYs2D"), and it was for about 25,615 USDT, 25,612 USDT of which was comprised of USDT traceable to victim funds.

111. In addition to the 25,615 USDT traceable to victim funds that was sent by TUrjmfUF to TGSRYs2D, the OKX Account sent a transaction to TGSRYs2D on about January 26, 2026, for about 252,013 USDT, that contained about 10,010 USDT that is traceable to victim funds. In total about 89% of the deposits into TGSRYs2D came from the OKX Account. Combining the transfers from the OKX account and TUrjmfUF that were sent to TGSRYs2D, it received about 35,623 USDT that is traceable to victim funds. On about March 4, 2026, TGSRYs2D transferred over 99% of its entire balance, about 427,881 USDT, containing about 10,010 USDT traceable to victim funds, to TKHf6n5ngMpA1SmhmvV1YdtHNimfDPM59r (Subject Address 2). This transfer was consolidated with a transfer from another address, TDVveyjd4Np9LkkbvPcDdoEVKd2LP9W2QY, explained below, which also contained victim funds.

112. Between about November 25, 2025, and February 26, 2026, TEycmGLrKjY89vm6vHBtyrHLrknLfaq2m5 ("TEycmGLr") received about 1,575,092 USDT from the OKX Account, which comprised over 99% of its total deposits. The deposits sent from the OKX Account into TEycmGLr contained about 85,125 USDT that is traceable to victim funds.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

113. On about January 1, 2026, TEycmGLr made a transfer to TDVveyjd4Np9LkkbvPcDdoEVKd2LP9W2QY ("TDVveyjd") for about 221,484 USDT, which contained about 32,811 USDT traceable to victim funds. The transfer of about 221,484 USDT was the first deposit into TDVveyjd.

114. The second deposit into TDVveyjd was from TFtUwuYG, which was for about 920,882 USDT, and contained about 149,492 USDT that is traceable to victim funds.

115. The next 29 transactions involving TDVveyjd consisted of 26 withdrawals for about 820,331 USDT, and three deposits of about 124,339 USDT. The next transaction, when the balance in TDVveyjd was about 446,374 USDT, was a deposit from TFtUwuYG into TDVveyjd, for about 809,470 USDT, which contained about 82,079 USDT traceable to victims. After this deposit, based on LIBR tracing, the balance in TDVveyjd of about 1,255,844 USDT contained about 264,384 USDT that is traceable to victim funds.

116. Three days later, on about February 6, 2026, TDVveyjd transferred over 99% of its USDT balance, about 830,022 USDT, to Subject Address 2. This transfer from TDVveyjd to Subject Address 2 contained about 264,378 USDT that is traceable to victim funds.

117. In total, Subject Address 2 received about 274,389 USDT (from TDVveyjd and TGSRYs2D) that is traceable to victim funds, which comprises about 27% of the seized balance of about 1,000,001 USDT.

//

//

//

//

//

//



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

118. The series of transactions from the OKX Account into Subject Addresses 1 and 2 are depicted below:




//

//

//

//

//

//



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**B. FUNDS TRACED TO SUBJECT ADDRESSES 3 AND 4**

119. Law enforcement traced approximately $138,224 in funds defrauded from nine identified victims to Subject Addresses 3 and 4, as described below:

***Victim 5 – Echo***

120. C.L., the daughter of Echo, reported to FBI that Echo told C.L. multiple times about some money that they had received. C.L. initially did not pay attention to Echo, but she eventually realized that Echo fell victim to a pig butchering scheme and she tried to get Echo to stop. Echo was reportedly instructed by "investment Professors" to send funds to multiple virtual currency addresses, including Ethereum address 0xa1cd54e3e0a3a49a82dc723c0f79d19a812b922b ("0xa1cd54"). The name of the fraudulent cryptocurrency investment platform that C.L. believed Echo was using was called SZVON.vip. C.L. sent the FBI a screenshot of Echo's supposed account, which is provided below. This interface, especially the missing commas in the numbers, is consistent across the interface of other platforms FBI agents have reviewed.






UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

121. On about February 24, 2026, Echo sent two transfers from their Coinbase account to 0xa1cd54, Echo's SZVON account, totaling approximately 49,980 USDC. These were the first two USDC deposits received by 0xa1cd54. The next USDC transaction in 0xa1cd54, also on February 24, 2026, was a withdrawal of the entire 49,980 USDC balance from 0xa1cd54 to 0x105c1378663d8959b5eecddb58c1c56aa8a36c6e ("0x105c13"). This was the first USDC deposit received by 0x105c13.

122. Between on or about February 24, 2026, and March 7, 2026, 0x105c13 received only two additional USDC deposits, but they did not amount to more than 0.0002 USDC. In the same timeframe, 0x105c13 made only three transfers, totaling approximately 49,980 USDC, its entire balance. Each transfer was sent to a decentralized swap service named Uniswap, where the USDC was swapped for USDT, a different cryptocurrency, and deposited back into 0x105c13 as USDT.

123. The first swapped USDT deposit was received by 0x105c13 on about February 24, 2026, and comprised approximately 997 USDT. Immediately before this deposit, the balance in 0x105c13 was approximately 2,834 USDT, which came from unknown sources. The next transaction in 0x105c13 was the second swapped USDT deposit, received by 0x105c13 on about March 4, 2026. After this deposit, the USDT balance in 0x105c13 was approximately 13,700 USDT; approximately 10,865 USDT of the balance was attributable to Echo.

124. The next transaction involving 0x105c13 was a withdrawal of approximately 10,000 USDT, to 0xad5cd161399b3686461164d2e086055dc8e53c55 (Subject Address 3). Based on LIBR tracing, this contained approximately 7,166 USDT attributable to Echo. The balance left in 0x105c13 at this time was approximately 3,700 USDT, all of which was attributable to Echo.

125. The next transaction involving 0x105c13 was the third and final swapped USDT deposit, received by 0x105c13 on about March 7, 2026, comprising approximately



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

38,478 USDT. The balance in 0x105c13 after this deposit was approximately 42,177 USDT, all of which was attributable to Echo, based on LIBR tracing. About one minute later, approximately 40,000 USDT, attributable to Echo, was transferred from 0x105c13 to Subject Address 3.

126. After Subject Address 3 received the approximately 40,000 USDT deposit from 0x105c13, its balance was about 40,003 USDT, which was 100% attributable to Echo, based on LIBR tracing.

127. On about March 7, 2026, the final USDT transaction involving Subject Address 3 was a withdrawal of approximately 30,000 USDT, leaving a balance in Subject Address 3 of approximately 10,002 USDT, all of which was attributable to Echo, and was seized.

128. A graphic depicting the transfers described above is provided below:




***Victim 6 – Foxtrot***

129. Foxtrot, who resides in the Western District of Washington, reported to the FBI that they invested approximately $32,000 with, or at the direction of, a company named MCUGS.com ("MCUGS"). Around December of 2025, Foxtrot came into contact with one or more representatives of MCUGS. First, MCUGS personnel advised Foxtrot to invest in a stock with ticker symbol POM, which they did, using $15,000 from their Charles Schwab account. Foxtrot said that the stock appeared to be a pump and dump and Foxtrot lost the entire investment.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

130. After Foxtrot's loss in the POM investment, MCUGS personnel offered them an opportunity to recover the stock losses through cryptocurrency investment opportunities. MCUGS personnel directed Foxtrot to send investment funds to Ethereum address 0x91a38fe2190b66594791c19cd35274438dec8bce ("0x91a38f"), where Foxtrot sent a total of approximately 3.43 ETH and approximately 11,850 USDT, collectively worth approximately $21,835 at the time of the transfers. Foxtrot sent a screen shot of their balance in MCUGS on April 1, 2026, which showed a balance of $213,232.7093, which was generated from Foxtrot's investment of approximately $21,835. A portion of the screenshot is provided below:




131. As of April 24, 2026, MCUGS had ceased communications with Foxtrot, and Foxtrot had yet to attempt to request a withdrawal. On April 27, 2026, Foxtrot tried to visit the MCUGS website, and they provided the FBI with a screenshot of what they saw, which is provided below:



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970




132. FBI's investigation determined that the investment fraud scheme used to defraud Foxtrot and other victims described in this Complaint used interstate and international wires in furtherance of the scheme.

**Foxtrot – *Ether transactions***

133. As described above, on about January 27, 2026, Foxtrot transferred approximately 3.43 ETH from their Coinbase account to 0x91a38f; this was its only deposit of ETH. On the same day, 0x91a38f transferred about 3.43 ETH to 0xa71233d0775f4bb6f12b44d227d64856cdcc7347 ("0xa71233"), the same address where USDT and USDC from other victims was consolidated (this is also identified as Consolidation Address 4, see paragraphs 90-94).

134. The subsequent ETH transactions are described in more detail below in the *Consolidation Address 4, 0xa71233 – ETH transactions* section, paragraphs 162-165.

***Foxtrot – USDT transactions***

135. Between on or about February 10, 2026, and March 9, 2026, Foxtrot sent about four transfers from their Coinbase account to 0x91a38f, totaling approximately 11,848 USDT, after paying transaction fees. These were the only deposits of USDT into 0x91a38f. After each transfer into 0x91a38f, a transfer of an equal amount was sent to 0xa71233, the consolidation address. Therefore, approximately 11,848 USDT attributable



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

to Foxtrot was transferred to 0xa71233, where it was consolidated with USDT attributable to at least three other victims, as well as USDT from unknown sources.

136. The subsequent transactions are described in the *Consolidation Address 4, 0xa71233 – USDT transactions* section, paragraphs 166-169.

***Victim 7 – Golf (USDT Transactions)***

137. Golf reported to the FBI that they lost approximately $96,000 because of a company named USCHC.com ("USCHC"). Someone who claimed to be David Smith was the representative of USCHC with whom Golf communicated.

138. According to Golf, they first invested in a stock that was supposed to make a lot of money, but Golf ended up losing about $37,000.

139. After losing money on the stock, Smith convinced Golf to do a compensation plan, and Golf joined a WhatsApp group called "CH-9 Compensation Plan," where Golf received instructions for investing with cryptocurrency.

140. Golf was instructed to send USDT to Ethereum address 0xc9de26f9d357af6e37569f7e34d1d42490d73275 ("0xc9de26") to partake in the compensation plan.

141. From on or about February 20, 2026, through March 11, 2026, Golf sent five transactions totaling approximately 56,831 USDT to 0xc9de26. These were the only deposits of USDT into 0xc9de26. From on or about February 21, 2026, through March 12, 2026, 0xc9de26 transferred all of the approximately 56,831 USDT attributable to Golf to 0xa71233, where it was consolidated with USDT from other victims and unknown sources.

142. As of April 17, 2026, Golf's USCHC account showed that they had a balance worth approximately $780,098. Golf tried to make a withdrawal, but they were advised that they needed to pay a $23,157 verification fee, which Golf refused. Golf was told by USCHC that, since Golf already initiated a withdrawal, the verification deposit was not an optional step, and it was a mandatory regulatory requirement that Golf must



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

complete to unlock and release their funds. Golf then tried to withdraw less funds, but USCHC said they could not change the withdrawal amount since Golf already initiated a full withdrawal.

143. The subsequent transactions are described in the *Consolidation Address 4, 0xa71233 – USDT transactions* section, paragraphs 166-169.

***Victim 8 – Hotel (USDC transactions)***

144. Hotel reported to the FBI that they were doing stock research on Facebook in or around July of 2025, where they found a phone number to call. The person with whom Hotel spoke invited them to a WhatsApp group that gave investing advice. Based on the investing advice, Hotel used their Robinhood and Fidelity accounts to invest in MIMI, EPSM, FMFC, and VSME. Hotel lost money on all of the investments. Hotel specifically recalled investing $43,000 in VSME in September 2025, and then it crashed and they lost the investment.

145. After losing money in the stocks, Hotel was contacted on WhatsApp about a compensation plan using a cryptocurrency trading platform called CZSRX.com ("CZSRX"). To invest using CZSRX, Hotel sent USDC to the address provided to them: 0xeedbf0e2341a3635c033ec01107753f0a8494be6 ("0xeedbf0").

146. Hotel initially sent an approximately 20,000 USDC transfer to CZSRX, but when Hotel signed onto their account, they "changed something," and Hotel lost all of their money. Hotel was told that they lost money because they made a mistake. Hotel was advised to send more funds to CZSRX to help them recoup the loss.

147. Overall, between on or about January 27, 2026, and April 11, 2026, Hotel transferred about 65,714 USDC to 0xeedbf0. These were the only deposits of USDC into 0xeedbf0. Between on or about January 29, 2026, and April 13, 2026, the approximately 65,714 USDC attributable to Hotel was transferred to 0xa71233, where it was consolidated with USDC from at least eight other victims, as well as USDC from unknown sources.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

148. Hotel's last transfer, on or about April 11, 2026, was made for the purpose of participating in a "sniping program," where Hotel was told their money could be doubled.

149. The subsequent transactions are described in the *Consolidation Address 4, 0xa71233 – USDC transactions* section, paragraphs 170-175.

***Victim 9 – India (USDC transactions)***

150. India reported to the FBI that they joined a learning group on WhatsApp named "Main Street Rising Club C17." The group was run by someone purporting to be Professor Marcus Ellington, and his assistant, Erin.

151. First, India was advised about which stocks to invest in. In accordance with advice given to the group, India made a test investment of approximately $500 in a stock with the symbol HCHL. Next, India was told to put what they learned into action and invest in a stock with the symbol DXST. India invested about $30,000 into DXST. The first two trades went well, but the third trade failed. India was told that someone infiltrated their group and shorted the stock, which caused it to lose. India lost approximately $17,000 of the investment in DXST. India was told by Ellington and Erin that they would "recompensate" the group for any losses related to DXST.

152. Eventually, India was approached by Professor Thomas Ellison, and his assistant, Grace, about getting "recompensated" for the DXST losses. India joined a WhatsApp group called "TY018 Compensation Action Group," where they used the USCHC platform to do crypto trading. India was instructed to send funds for trading to 0x71373d759f413e72e785a29ff389cd88eabe2717 ("0x71373d").

153. At first, India was using his Robinhood account to make transfers, but he was told to switch to Coinbase because of the $5,000 transfer limit imposed by Robinhood.

154. In total, between on or about March 6, 2026, and April 10, 2026, India transferred approximately 148,284 USDC from their Robinhood and Coinbase accounts



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

to 0x71373d. These were the only USDC deposits received by 0x71373d. Between on or about March 6, 2026, and April 11, 2026, the 148,284 USDC attributable to India was transferred from 0x71373d to 0xa71233, where it was consolidated with USDC from other victims and unknown sources.

155. India was able to make one withdrawal from USCHC for approximately $100. India recalled one day when one of their trades failed and they lost all of their money.

156. The subsequent transactions are described in the *Consolidation Address 4, 0xa71233 – USDC transactions* section, paragraphs 170-175.

***Victim 10 – Juliet (USDC transactions)***

157. One day Juliet was randomly contacted online by a stock trading group, which they joined. Juliet's first couple of trades with the group made money. Juliet was then given a big trade with the stock KXIN. According to Juliet, they used a Robinhood account to invest approximately $220,000 into KXIN on about January 28, 2026, and on about January 29, 2026, the stock crashed and Juliet suffered a loss.

158. According to Yahoo Finance, the share price of KXIN at close on January 28, 2026, was $205.50/share. The closing price of KXIN on January 29, 2026, was $151.95/share, and the closing price on January 30, 2026, was $18.00/share.

159. Later, Juliet was approached online by someone who claimed they could make up for Juliet's losses with KXIN if Juliet used the USCHC trading platform. Related to this, Juliet joined a WhatsApp group named, "BZ005 Compensation Action Group," and their main contact was someone using the name Stella Evans. Juliet was directed to send USDC to 0x8c04347dad9595b20059acb9f833bc66f8b224ac ("0x8c0434") for trading.

160. Between on or about March 7, 2026, and March 9, 2026, Juliet sent about 25,147 USDC to 0x8c0434. These were the only deposits of USDC received by 0x8c0434. Between on or about March 9, 2026, and March 11, 2026, the 25,417 USDC


UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

attributable to Juliet was transferred from 0x8c0434 to 0xa71233, where it was consolidated with USDC from other victims and unknown sources.

161. The subsequent transactions are described in the *Consolidation Address 4, 0xa71233 – USDC transactions* section, paragraphs 170-175.

***Consolidation Address 4, 0xa71233 – ETH transactions***

162. After receiving the 3.43 ETH on January 27, 2026, that was attributable to Foxtrot, the balance in 0xa71233 was approximately 7.00 ETH. 0xa71233 received one additional deposit on the same day, from an unknown source, comprising approximately 0.03 ETH. At this time, the balance in 0xa71233 was approximately 7.04 ETH, and approximately 3.43 ETH was attributable to Foxtrot, based on LIBR tracing.

163. Also on January 27, 2026, the next ether transaction involving 0xa71233 was a withdrawal of about 7 ETH to 0xfcfde3361d2d834f5dd094156d22bdea5cbf69a3 ("0xfcfde3"). Based on LIBR tracing, approximately 3.39 ETH was attributable to Foxtrot. After receiving this transfer the balance in 0xfcfde3 was approximately 9.19 ETH.

164. On about January 28, 2026, when the balance in 0xfcfde3 was still approximately 9.19 ETH, the next transaction was a transfer of approximately 9 ETH to the OKX Account (the same account described at Paragraph 96). About 3.2 ETH was attributable to Foxtrot based on LIBR tracing.

165. Later, on or about March 2, 2026, when the balance in 0xfcfde3 was approximately 4.09 ETH, approximately 4 ETH were transferred to the OKX Account. About 0.09 ETH was attributable to Foxtrot based on LIBR tracing. In total, about 3.3 ETH attributable to Foxtrot was transferred to the OKX Account. The ETH was not traced to the Defendant Cryptocurrency and is therefore not further described here.

//

//

//



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

***Consolidation Address 4, 0xa71233 – USDT transactions***

166. Based on LIBR tracing, between on or about November 29, 2025, and March 12, 2026, approximately 83,341 USDT attributable to at least four victims were transferred to 0xa71233. The victim designation and the corresponding fraudulent crypto trading platform they used are provided in the table below:

| **Victim** | **Scam** |
|---|---|
| Foxtrot | MCUGS.com |
| Golf | USCHC.com |
| Kilo | CZSRX.com |
| Lima | OKZYC.com |

167. From on or about November 29, 2025, through April 1, 2026, 0xa71233 received and sent USDT traceable to victims. During that time, the victim funds were commingled with a total of approximately 4,887,194 USDT (including victim USDT). Based on LIBR tracing, USDT traceable to victims were transferred from 0xa71233 to three different addresses, including 0xfcfde3.

168. In total, from on or about January 21, 2026, through April 1, 2026, about 2,103,663 USDT was transferred from 0xa71233 to 0xfcfde3, which comprised about 99% of the USDT deposits received by 0xfcfde3 during that time. Of this amount, about 76,554 USDT were traceable to known fraud victims, based on LIBR tracing.

169. From on or about January 21, 2026, through April 1, 2026, approximately 2,190,498 USDT was transferred from 0xfcfde3 to the OKX Account. About 76,554 USDT was traceable to victims of the fraudulent cryptocurrency investment platforms.

//

//

//

//



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

***Consolidation Address 4, 0xa71233 – USDC transactions***

170. Based on LIBR tracing, from on or about November 22, 2025, through April 13, 2026, approximately 391,393 USDC attributable to at least nine victims was transferred to 0xa71233. The victim initials and the corresponding fraudulent crypto trading platform they used are provided in the table below:

| Victim | Scam |
|---|---|
| Hotel | CZSRX.com |
| India | USCHC.com |
| Juliet | USCHC.com |
| Kilo | CZSRX.com |
| Mike | CZSRX.com |
| November | Unknown |
| Oscar | CZSRX.com |
| Papa | Unknown |
| Quebec | USCHC.com |

171. From on or about November 22, 2025, through April 13, 2026, 0xa71233 received and sent USDC traceable to victims. During that time, the victim funds were commingled with a total of approximately 2,468,275 USDC (including victim USDC). Based on LIBR tracing, USDC traceable to victims were transferred from 0xa71233 to four different addresses, including about 242,135 USDC to 0xfcfde3, and about 105,084 USDC to 0xa8c23d069bcce47ea711d5e442e33af23e02cba7 (“0xa8c23d”).

172. Regarding 0xfcfde3, between on or about January 16, 2026, and April 1, 2026, 0xa71233 transferred approximately 1,328,495 USDC to 0xfcfde3; about 242,135 USDC was traceable to known fraud victims, based on LIBR tracing.

173. From on or about January 17, 2026, through April 1, 2026, 100% of the USDC transfers sent from 0xfcfde3, which totaled approximately 1,328,495 USDC, went



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

to the OKX Account. Approximately 242,135 USDC was traceable to victims of the fraudulent cryptocurrency investment platforms.

174. Regarding 0xa8c23d, from on or about April 3, 2026, through April 13, 2026, 0xa71233 transferred about 203,611 USDC to 0xa8c23d; about 105,084 USDC was traceable to known fraud victims, based on LIBR tracing.

175. From on or about April 3, 2026, through April 13, 2026, 0xa8c23d transferred about 113,853 USDC to the OKX Account. Approximately 54,905 USDC was traceable to victims of the fraudulent investment platforms.

176. Two separate graphics depicting the USDT and USDC transfers described above are provided below:

**USDT Graph**




//

//

//

//



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**USDC Graph**




***OKX Account* USER ID 509087299267645635 *(Also described in Paragraph 96)***

177. As described in the sections above relating to Subject Address 4, the OKX Account received cryptocurrency deposits that are traceable to victims of the fraudulent cryptocurrency investment platforms described herein, including approximately 3.3 ETH, approximately 297,041 USDC, and approximately 76,554 USDT.

178. FBI reviewed records provided by OKX for the OKX Account, including deposit history, trading history, funding account history, and withdrawal history. The records show that the USDC and USDT traceable to the fraud victims described herein were converted to USDT that is transferrable on the TRON blockchain.

***OKX Account to Subject Address 4, TUsXPpG2QoyrpkQzMkbMEbcfttEga88juH***

179. The OKX Account made two transfers to Subject Address 4 that contained funds traceable to victims.

180. On about March 13, 2026, when the balance in Subject Address 4 was about 59,081 USDT, the OKX Account transferred about 245,406 USDT to Subject Address 4, which contained about 87,902 USDT traceable to victims.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

181. The next and final USDT transaction involving Subject Address 4 was on about March 24, 2026, when the OKX Account transferred approximately 223,956 USDT to Subject Address 4, which contained about 40,319 USDT traceable to victims. Based on LIBR tracing, the balance of about 528,444 USDT in Subject Address 4 at seizure included approximately 128,221 USDT (24% of the balance) that is traceable to victims of the fraudulent cryptocurrency investment platforms.

182. The transactions described above were designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, and/or control of the proceeds of the underlying investment fraud scheme. Specifically, among other attributions of money laundering, the transactions involved rapid movement of virtual currencies across multiple addresses, swapping virtual currencies from one token to another, moving from one blockchain to another, and commingling fraud proceeds with virtual currency from other, unidentified sources.

## IX. CLAIM FOR RELIEF

183. As required by Supplemental Rule G(2)(f), the facts set forth in this Verified Complaint support a reasonable belief that the United States will be able to meet its burden of proof at trial. More specifically, these facts support a reasonable belief that the United States will be able to prove by a preponderance of the evidence that the Defendant Cryptocurrency is property that constitutes or is derived from proceeds of Wire Fraud, in violation of 18 U.S.C. § 1343, and is, therefore, forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C); and that Defendant Cryptocurrency is property involved in, or traceable to property involved in Money Laundering, in violation of 18 U.S.C. § 1956, which transactions involved proceeds of specified unlawful activity, that is, Wire Fraud, in violation of 18 U.S.C. § 1343, and that the Defendant Cryptocurrency is therefore also forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

//



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

WHEREFORE, the United States respectfully requests:

A. A warrant issue for the arrest of the Defendant Cryptocurrency;

B. That due notice be given to all interested parties to appear and show cause why the Defendant Cryptocurrency should not be forfeited;

C. The Defendant Cryptocurrency be forfeited to the United States for disposition according to law; and

D. For such other and further relief as this Court may deem just and proper.

DATED this 20th day of November, 2026.

*s/Krista K. Bush*

KRISTA K. BUSH
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Phone: (206) 553-2242
Fax: (206) 553-6934
Krista.Bush@usdoj.gov

**VERIFICATION**

I, Andrew Cropcho, I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since May 2018. I am currently assigned to the Seattle Field Office.

My primary duties as an FBI Special Agent include investigating violations of federal law, including financial fraud, corporate fraud, securities fraud, government program fraud, and healthcare fraud. Part of those duties include investigating instances of wire fraud being used for financial gain at the expense of others, which has involved examining financial accounts and obtaining and reviewing data from warrants for electronic devices and online accounts, including social media, cloud storage, and e-mail accounts. Before my career as an FBI Special Agent, I was employed at a large public accounting firm for over three years and, as part of my employment, I examined financial information of clients to determine their accuracy, reliability, and sources.

In the scope of my duties as an FBI Special Agent, within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States, I am authorized to request the issuance of a federal seizure warrant.

I am also an investigating or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations and to make arrests for federal offenses. I furnished the investigative facts contained in the foregoing Verified Complaint for Forfeiture *In Rem*. The investigative facts are based on personal knowledge I obtained from my involvement in the underlying investigation, my review of the relevant investigative material, other federal agencies and law enforcement officers involved in the investigation, other reliable official Government sources, and my own training and experience.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

I hereby verify and declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that I have read the foregoing Verified Complaint for Forfeiture *in Rem*, that I know its contents, and that the facts it contains are true and correct to the best of my knowledge.

Executed this 19th day of November, 2026.

ANDREW CROPCHO
Digitally signed by ANDREW CROPCHO
Date: 2026.11.19 16:51:10 -08'00'

ANDREW CROPCHO
Special Agent
Federal Bureau of Investigation



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970